Law Offices of
DENA MARIE YOUNG (CSB #215344)
2751 4th Street, PMB #136
Santa Rosa, A 95405
Telephone: (707) 528-9479
Facsimile: (707) 692-5314
Email: dmyounglaw@gmail.com

Attorney for Defendant
KATRINA MARAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KATRINA MARAS,<br><br>Defendant. | No. 3:21-cr-00054 VC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS** |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF THE CASE**

Defendant, KATRINA MARAS, is charged in a single-count Indictment with fraudulent use of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(5). Ms. Maras has entered a plea of Not Guilty. This matter has been set for jury trial on August 25, 2021 with a Pretrial Conference date of August 18, 2021.

**II.**

**FACTUAL SUMMARY** [1]

Ms. Maras was employed at the dental office of K.A. in Santa Rosa, California, from approximately February through September of 2017. Her work included making purchases for the

---

[1] The statement of facts is a summary based on Defense Counsel's review of discovery and other items relevant to this case. (See Declaration of Counsel and Exhibits)

-1-
MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

office using credit cards provided by K.A. and tracking billing and payments for the clients of the practice.

On November 18, 2017, Katrina Maras' home in Santa Rosa, California was searched, based on a warrant targeted at her partner, Wilfred Fonteno, and his connection to the Hells Angels Motorcycle Club. A number of electronic devices were seized on that occasion.

In July of 2020, the government obtained an arrest warrant issued by Magistrate Judge Corley based on allegations that from June – September of 2017 Katrina Maras embezzled funds from a former employer through unauthorized use of a credit card.

On July 29, 2020 at around 8:00 am, Katrina Maras drove away from her home in Menafee, California. Her infant son was in a safety seat in the back of the car. At the direction of federal agents, California Highway Patrol Officer Robert Stage stopped Ms. Maras's car approximately 18 minutes later. Ms. Maras' phone was taken from her. Ms. Maras, who was pregnant with her second child, was placed in another vehicle, separated from her son, who was left alone in the back of her car. The boy's father, Mr. Fonteno, was called to collect him. Agents moved Ms. Maras' car with the boy inside to a second location at a local I-Hop restaurant for the exchange. The arrest of Ms. Maras and the return of the child to Mr. Fonteno involved not only CHP Officer Stage, but at least five additional federal agents[2], some of whom were armed with AR-style rifles.

Ms. Maras was driven by several agents to the federal courthouse in Riverside, California. They arrived at the courthouse just before 10:00 am. She was taken to a second-floor interview room by several agents. There, Ms. Maras was initially interviewed by Special Agents Boswell and Trombetta. A second interview focused on the subject of Hells Angels was conducted by Task Force Officers Harm and Menke. Both interviews were conducted in the presence of conducted by Assistant United States Attorney Kevin Barry.

Ms. Maras was read her Miranda rights approximately 8 minutes into the first interview. During the course of the interviews Ms. Maras' phone was in the room, but she was not permitted to answer it. At various times she expressed concern about her employer, and about leaving her young son with his

---

[2] These agents are FBI Special Agents Noel Boswell, and Anne Trombetta, Task Force Officers William Harm, Travis Menke, and Gregory Andres.

-2-
MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

father, Mr. Fonteno for an extended period of time.  Ms. Maras wondered aloud if she should talk to a lawyer.  She expressed her confusion about what she should do and not wanting to give the wrong answers.  In response, AUSA Barry told her that she had the right to do that, and that the interview would stop, and the court process would start.  He then proceeded to tell her about the charges she was facing, the maximum penalties (15 years) and the court process.  Ms. Maras ultimately did not ask for a lawyer.

AUSA Barry then told her that Task Force Officers Harm and Menke wanted to interview her regarding Sonoma County Hells Angels separate from her case.  The second interview ran nearly another two hours. She was interviewed, in part, about information derived from items which had been seized from her Santa Rosa home in 2017.

## III.

## ARGUMENT

### ANY STATEMENTS MADE BY MS. MARAS SHOULD BE SUPPRESSED

A. **The Government Must Demonstrate Compliance with *Miranda***

In their reports, Agent Boswell claims that Ms. Maras was read her Miranda rights, that she waived those rights, and subsequently made incriminating statements.

1. <u>*Miranda* Warnings Must Precede Custodial Interrogation</u>

The Supreme Court has held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. See *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The law imposes no substantive duty upon the defendant to make any showing other than that the statement was taken from the defendant during custodial interrogation. *Id.* at 476. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* at 477; see *Orozco v. Texas*, 394 U.S. 324, 327 (1969). In *Stansbury v. California*, the Supreme Court clarified its prior decisions by stating that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. 318, 323 (1994). The Ninth Circuit has held that a

suspect will be found to be in custody if the actions of the interrogating officers and the surrounding circumstances constrained the suspect's freedom of movement in such a way that a reasonable person in that situation would not have felt free to leave. *United States v. Basher*, 629 F.3d 1161, 1166 (9th Cir. 2011). In determining whether a person is in custody, a reviewing court must consider the language used to summon the defendant, the physical surroundings of the interrogation, and the extent to which the defendant is confronted with evidence of his guilt. See *United States v. Estrada-Lucas*, 651 F.2d 1261 (9th Cir. 1980). A court should also consider the duration of the detention and the degree of pressure used to detain the individual. See *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009). Once a person is in custody, Miranda warnings must be given prior to any interrogation. Miranda warnings must advise the defendant of each of his or her "critical" rights. See *United States v. Bland*, 908 F.2d 471, 473 (9th Cir. 1990). The warnings must clearly convey these critical rights, and the agents may not undercut or contradict the purpose behind *Miranda* by offering their own explanation of the warnings' meaning. See *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (*en banc*). Furthermore, if a defendant indicates that he wishes to remain silent or requests counsel, the interrogation must cease immediately. See *Miranda,* 384 U.S. at 473- 74; see also *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

    2.    <u>The Government Bears the Burden to Demonstrate that Ms. Maras' Alleged Waiver was Knowing, Intelligent and Voluntary</u>

For a defendant's inculpatory statements to be admitted into evidence, the defendant's "waiver of *Miranda* rights [during custodial interrogation] must be voluntary, knowing and intelligent." *United States v. Binder*, 769 F.2d 595, 599 (9th Cir. 1985) (citing *Miranda* 384 U.S. at 479), overruled on other grounds by *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (*en banc*); see also *United States v. Vallejo*, 237 F.3d 1008, 1014 (9th Cir. 2001); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). When interrogation continues in the absence of an attorney, and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived his privilege against self-incrimination and his right to counsel. See *Miranda*, 384 U.S. at 475. In fact, the Ninth Circuit has held that "[t]here is a presumption against waiver." *United States v. Garibay*, 143 F.3d 534, 536-37 (9th Cir.1998) (citing *United States v. Bernard S.*, 795 F.2d 749, 752 (9th Cir. 1986)) (other internal citations omitted); see also *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984) (stating

that the court must indulge every reasonable presumption against waiver of fundamental constitutional rights) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The validity of the waiver depends upon the particular facts and circumstances surrounding the case, including the background, age, experience, and conduct of the accused. See *Edwards,* 451 U.S. at 482; *Zerbst*, 304 U.S. at 464; see also *Doody*, 649 F.3d at 1008; *Garibay*, 143 F.3d at 536; see also *Bernard S.*, 795 F.2d at 751 (stating that "[a] valid waiver of *Miranda* rights depends upon the totality of the circumstances, including the background, experience and conduct of the accused"). A determination of the voluntary nature of a waiver "is equivalent to the voluntariness inquiry [under] the [Fifth] Amendment." *Derrick v. Peterson*, 924 F.2d 813, 820 (9th Cir. 1990). A determination of whether a waiver is knowing and intelligent, on the other hand, requires a reviewing court to discern whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id.; see also *United States v. Amano*, 229 F.3d 801, 805 (9th Cir. 2000); *Garibay*, 143 F.3d at 536. This inquiry requires that a court determine whether "the requisite level of comprehension" existed before upholding the purported waiver. *Derrick*, 924 F.2d at 820. Thus, "[o]nly if the `totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Id*. (citations omitted). Unless and until the government satisfies its burden to demonstrate that sufficient *Miranda* warnings were given, and that Ms. Maras knowingly and intelligently waived her rights, no evidence obtained as result of the interrogation can be used against her. See *Miranda*, 384 U.S. at 479.

B. **Ms. Maras' Statements Must Be Suppresses as They Are the Result of a Deliberate Two-Step Interrogation in Violation of *Miranda* and *Williams***

Even voluntary post-Miranda statements must be suppressed when they are the result of a deliberate two-step interrogation process to circumvent *Miranda*; that is, where the midstream *Miranda* warning was objectively ineffective in conveying to the accused his Fifth Amendment rights, even voluntary statements must be suppressed. *United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006) at 1157; *Missouri v. Seibert*, 542 U.S. 600 (2004).

1. Determining Deliberateness

When an individual is in custody, there is "rarely, if ever, a legitimate reason to delay giving the *Miranda* warning." *United States v. Williams*, 435 F.3d 1148, 1159. In determining whether the delay in giving *Miranda* warnings was deliberate the Court should consider the following: 1) the timing, setting and completeness of the pre-warning interrogation, 2) the continuity of police personnel, and 3) the overlapping content of the pre- and post-warning statements. *Williams*, 435 U.S. at 1158. In *Seibert*, the interrogating officer candidly admitted that the two-step interrogation strategy was deliberately used in conformity with advice from police training manuals advancing efficacy of the technique for obtaining confessions. *Seibert*, 542 U.S. at 609. Because, however, it would be a rare instance where the police officer would so candidly admit his intent to dilute the effectiveness of the *Miranda* warnings by giving them mid-stream, the Court noted that district courts should look to the facts "apart from [the officer's] intent to show the question-first tactic at work." *Id.* at 616 n.6.

The facts here are suggestive of a deliberate two-step process. Ms. Maras was arrested at approximately 8:18 in the morning. She was transported in the company of several federal agents to the Federal Courthouse in Riverside for a formal interview. Based on the agent's report, that transportation took approximately an hour and forty minutes. The conversations of the agents with Ms. Maras during that period of transportation were not recorded. In the recording (Exhibit C), Agent Boswell makes statements that these conversations were not about the case, but we have only her unsupported statement to that effect.

Ms. Maras was not advised of her *Miranda* rights until the recorded portion of the interview at the Riverside Courthouse which appears to have followed shortly after the transportation.

These facts suggest that the Agents may have engaged in a deliberate two-step interrogation technique in order to circumvent the strictures of *Miranda*. There is no justification for the agents' failure to administer the *Miranda* warnings to Ms. Maras immediately upon her arrest since they engaged in conversation with Ms. Maras during a lengthy drive to the courthouse.

2.   Determining the Effectiveness of Warnings

The *Miranda* warnings were born out of the Supreme Court's recognition that custodial interrogation is inherently coercive. *Miranda*, 384 U.S. at 439; *United States v. Dickerson*, 530 U.S. 428, 435 (2000). "[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk" that the privilege against self-incrimination will not be observed. *Missouri v. Seibert*, 542 U.S. 600, 608 (quoting *Dickerson v. United States*, 530 U.S. 428, at 444). In deciding that *Miranda*'s rule was of Constitutional dimension, the Supreme Court cited its concern that the custodial interrogation is so inherently coercive that the traditional test for voluntariness posed an "unacceptably great" risk that involuntary confessions would go undetected by the Courts. *Seibert*, 542 U.S. at 608; *Dickerson*, 530 U.S. at 442.

The *Miranda* warnings were created to adequately and effectively inform the accused of his 5th Amendment rights. Although the statements preceded by *Miranda* warnings have generally been given a "virtual ticket of admissibility," *Seibert*, 542 U.S. at 609, the mere "recitation of the litany" does not satisfy *Miranda* in every circumstance. *Id.* at 611. In fact, in the context of mid-stream warnings, Justice Souter noted that the accused could hardly believe that he had a right to remain silent after the police had already questioned him, then warned him and asked him to repeat the same admissions. *Id.* at 613. "A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for a knowledgeable decision." *Id.*

In determining the effectiveness of the warnings the Court must consider: 1) the completeness and detail of the pre-warning interrogation, 2) the overlapping content of the two rounds of interrogation, 3) the timing and circumstances of both interrogations, 4) the continuity of police personnel, 5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first, and 6) whether any curative measures were taken. *Williams*, 435 F.3d at 1160.

All of these factors support a finding that the *Miranda* warnings given by the agents were ineffective. Ms. Maras was arrested by a number of federal agents, some who wanted to talk about the embezzlement case, while others wanted to discuss the Hells Angels. She was transported by car with a part of this same group of agents, a trip which took about an hour and forty minutes. The conversation during the transportation was not recorded, yet the subsequent recording makes clear that some

conversation took place during that time. At the courthouse, a recording was started, and *Miranda* warnings read. Ms. Maras was the interrogated regarding her work, then later regarding the Hells Angels. Thus, the recorded interrogations were nearly continuous with the transportation in which the initial interrogation took place. No curative measures were taken, such as informing Ms. Maras that her prior un-*Mirandized* statements would not be admissible against her at trial.

    C. **Ms. Maras' Statements Were Involuntary**

Even when *Miranda*'s procedural safeguards have been satisfied, a defendant in a criminal case is deprived of due process of law if his conviction is founded upon an involuntary confession. See *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Jackson v. Denno*, 378 U.S. 368, 387 (1964). The government bears the burden of proving– by a preponderance of the evidence– that a confession is voluntary. See *Lego v. Twomey*, 404 U.S. 477, 483-84 (1972).

A voluntary statement must be the product of a rational intellect and free will. See *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). In determining the voluntariness of a confession, the Ninth Circuit has required consideration of "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993) (citations omitted); see also *Bustamonte*, 412 U.S. at 226. Factors a reviewing court should consider when determining voluntariness include the youth of the accused, lack of education, low intelligence, the absence of any advice regarding the accused's constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment (such as the deprivation of food or sleep), to determine if law enforcement officers elicited a voluntary confession. See <u>Bustamonte</u>, 412 U.S. at 226. Importantly, the Court must consider the totality of the factors and circumstances, and determine whether they cumulatively show voluntariness; it may not "tick[] off the list of circumstances" and consider each one "piecemeal." *Doody*, 649 F.3d at 1011.

In general, a statement is considered involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (*per curiam*) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)); see also *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (agent's express statement that defendant would not see her child "for a while" and warning that she had "a lot at stake,"

referring specifically to losing her child, were patently coercive and defendant's resultant confession held involuntary).

Here, Ms. Maras' statements were involuntary. Ms. Maras was followed driving away from her home for nearly twenty minutes before she was stopped by law enforcement. Her infant son was in a car seat in the back. She was pregnant with her second child. Ms. Maras was separated from her son who was left in the car alone. She had to watch as an agent drove her car away with her son to a second location to be turned over to his father. Despite the fact that the alleged crime involved only misuse of a credit card several years before, Ms. Maras was confronted by multiple armed agents.

She was deprived of her phone. She was worried about her employer. She was worried about her son being left alone with his father for an extended period of time. She was arrested by numerous armed agents. She was not told what she was charged with or the potential exposure from those charges until two hours into the recorded interview.[3] Although Ms. Maras did not expressly ask for a lawyer, she expressed concern that she should probably talk to an attorney because she was confused by the situation and she did not want to give the wrong answers. The implication throughout the interviews was that if she answered their questions, she would be able to go home, but if she did not, she would be placed in custody and thus deprived of her job and her son.

Under these circumstances, Ms. Maras would not have felt that she had any real option to stop the interrogation despite the *Miranda* warnings. Her statements were not voluntary.

D. **This Court Should Conduct an Evidentiary Hearing.**

This Court must conduct an evidentiary hearing to determine whether Ms. Maras' statements should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Ms. Maras are voluntary. In addition, 18 U.S.C. § 3501(b) requires this Court to consider various enumerated factors, including Ms. Maras' understanding of her rights and of the charges against her. Without an evidentiary hearing, this Court cannot adequately consider these factors. Moreover, § 3501(a) requires this Court to make a factual determination. If a factual determination is required, courts must make factual findings by Fed. R. Crim. P. 12. See *United States v.*

---

[3] This advisement was made by AUSA Barry in response to Ms. Maras' comments about maybe wanting to talk to a lawyer.

*Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990). Since "'suppression hearings are often as important as the trial itself,'" *id.* at 609-10 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in the government's pleading.

## IV.
## CONCLUSION

For the foregoing reasons, Ms. Maras respectfully requests that this Court should grant suppression of her post arrest statements in this case.

Dated: May 7, 2021                Respectfully submitted,

                                          /s/
                                 DENA MARIE YOUNG

                                 Attorney for Defendant
                                 KATRINA MARAS