1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney

2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  KEVIN J. BARRY (CABN 229748)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-6840
7       FAX: (415) 436-7234
        Email: kevin.barry@usdoj.gov
8
   Attorneys for United States of America
9
                        UNITED STATES DISTRICT COURT
10
                     NORTHERN DISTRICT OF CALIFORNIA
11
                          SAN FRANCISCO DIVISION
12

13  UNITED STATES OF AMERICA,              )  CASE NO. CR 21-0054 VC
                                           )
14          Plaintiff,                      )  **UNITED STATES' OPPOSITION TO**
                                           )  **DEFENDANT'S MOTION TO SUPPRESS**
15      v.                                  )  **STATEMENTS**
                                           )
16  KATRINA MARAS,                          )  Hearing Date:   June 22, 2021
                                           )  Hearing Time:   2:00 pm (Video conference)
17          Defendant.                      )
                                           )  Hon. Vince Chhabria
18  _____)

19                            **INTRODUCTION**

20          Defendant Katrina Maras moves the Court to suppress statements she made to agents in a

21  recorded interview after her arrest.  She claims that the mere possibility that there was a two-step

22  interrogation is sufficient to suppress.  She does not however, state that such an interrogation actually

23  took place, and she does not indicate whether she made any pre-*Miranda* statements that were repeated

24  after agents advised her of her rights.  She also asserts that her statements were involuntary, but she

25  offers no facts to support that claim.  The Court should deny the motion.

26                          **STATEMENT OF FACTS**

27          In the morning of July 29, 2020, agents of the FBI and undersigned counsel interviewed

28  Defendant in conference room at the Federal Courthouse in Riverside, California following her arrest.

The interview was recorded. Dkt. 25-2, Ex. C. The interview began as FBI Special Agent Ann Trombetta and Ms. Maras waited for the case agent, FBI Special Agent Noel Boswell, and others to arrive. As they were waiting, Ms. Maras and the agent had a several-minute conversation about childcare, during which Ms. Maras shared photographs of one of her children. *Id.* at 0:00 – 5:00. The conversation continued to the topics of hair care, height, and some family history. *Id.* at 5:00 – 7:30. The tone was light and cordial. During the first few minutes of the interview, there was no discussion about the case, about Defendant's prior employment, or about any criminal conduct.

Once others arrived, including the case agent and undersigned counsel, there was a brief discussion of logistics, including making arrangements to provide food. SA Trombetta then read Ms. Maras her *Miranda* rights. *Id.* at 8:10-8:30. SA Trombetta asked Ms. Maras whether she understood her rights, and Defendant responded affirmatively. *Id.*

The agent then touched on some history, including a 2017 search of a residence Ms. Maras shared with her partner, Wil Fonteno. That search was directed at her partner, and it was part of the investigation that led to the RICO / VICAR murder case of *United States v. Nelson, et al.*, CR 17-0533 EMC, currently pending before Judge Chen. During that brief introduction, the agent also referenced an initial conversation during Defendant's arrest. "You touched a little bit on the dentist's office; I told you to stop talking—we'd talk about that later." *Id.* at 8:30-8:55. [1] Ms. Maras then expressed how surprised she was to be arrested for anything in connection with that office. "It completely, like, took me by surprise. Yeah . . . So I'm trying to, like, go through my head to even think, like, how that could even be interpreted." *Id.* at 8:55-9:08. SA Trombetta then turned over the interview to the case agent, SA Boswell, and SA Boswell began questioning Defendant about her use of the dental office credit card. *Id.* 9:08 ff.

Roughly 33 minutes into the interview, SA Trombetta asked some questions. As with SA Boswell's questions, the tone remained cordial. "The only thing I'm asking you today, and I'm not accusing you of anything, other than—obviously you are under arrest, right; you're being detained—is just to tell us the truth. At the end of the day, whether . . . if you don't remember something, just tell us

---

[1] A transcript of the interview has been ordered. Once obtained, the government will lodge it with the Court. Citations to the recording represent counsel's interpretation of what was said.

you don't remember.  Don't make anything up.  Just don't lie to us.  You know, if we ask you a question and you don't want to answer it, I'd rather just have you say 'I don't want to answer' than lie." *Id.* at 33:45-34:30.  SA Trombetta continued: "Just the truth.  If you don't remember something, you don't remember.  And that's OK, too.  We just don't want you to make anything up.  Or to lie.  Because that's . . . bad, right?  Don't lie to the FBI.  Every show says that." *Id.* at 35:15.  This polite, relatively informal exchange was typical of the tenor of the entire interview.

Roughly and hour and thirty minutes into the interview, after Ms. Maras stated that she did not make personal purchases on the dental office credit card without authorization, the case agent indicated that she had records showing hundreds of such purchases.  Dkt. 25-2, Ex. C at 1:31:20.  When asked how many times she made authorized purchases, and what her response would be if the dentist said it only happened once, Ms. Maras stated something to the effect of "I really don't know how to answer some of these [questions] properly.  I don't know if I should call a lawyer at this point.  Maybe that will help me do this, because I don't want to answer something improperly and then it be held [against me] because I didn't know how to answer something the correct way." *Id.* at 1:44:00 – 1:45:30.  Roughly a minute after this equivocal reference to counsel, the agents and undersigned counsel paused the interview.

After approximately fifteen minutes, the interview resumed to address the issue of Ms. Maras' statement about a lawyer.  Undersigned counsel explained to Ms. Maras that she had the right to talk to a lawyer, and that if she wanted to do so, the interview would stop.  *Id.* at 2:00:00.  The next steps of the judicial process were then discussed, including the specific charge and its maximum penalties; the fact that Ms. Maras would get a time to appear in San Francisco, possibly virtually;[2] the fact that she would have counsel; and that the case would then proceed, either to a plea or to trial.  *Id.* at 2:00:00 – 2:02:55.  The fact that Ms. Maras has right to a lawyer was repeated and emphasized, as was the fact that if she indicated that she did not want to speak to agents or wanted to speak to a lawyer, the interview would end.  *Id.* at 2:02:55 – 2:03:50.  Ms. Maras then indicated that she understood that she had the right to talk

---

[2] The possibility of a virtual appearance was discussed in the context of the COVID-19 pandemic.  There was no implication that a virtual appearance—as opposed to appearing in custody—was dependent on Defendant's waiver of any *Miranda* rights.

to a lawyer, and she specified that she was not invoking that right. *Id.* 2:04:15 – 2:05:05.

The interview then shifted to a different investigation in which Defendant is viewed as a witness and not a target. Although further questioning about this case during the interview was presented as a possibility, agents did not return to the topic, and they asked no further questions about this case.

## ARGUMENT

### I. There Was No Two-Step Interrogation

In *Missouri v. Siebert*, the Supreme Court addressed the circumstance where police question a suspect without a *Miranda* advisement, secure an incriminating statement, and then advise the suspect of his or her rights and repeat the questions that elicited the incriminating statement. *Id.*, 542 U.S. 600 (2004). In that circumstance, the Court held that a *Miranda* warning would have little effect, because the person who already confessed would not be likely to invoke the right to remain silent after having spoken openly. "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613. The Supreme Court held that the initial confession rendered the *Miranda* warning ineffective, because the earlier questions and incriminating answers did not allow "for a real choice between talking and remaining silent." *Id.* at 609.

The Court set forth a series of factors to consider in assessing whether subsequent post-*Miranda* statements can be admissible in the wake of a non-*Mirandized* confession:

- the completeness and detail of the questions and answers in the first round of interrogation;

- the over-lapping content of the two statements;

- the timing and setting of the first and the second;

- the continuity of police personnel; and

- the degree to which the interrogator's questions treated the second round as continuous with the first.[3]

---

[3] In light of the fact that the *Siebert* decision was a plurality opinion that was joined with several concurring opinions, the Ninth Circuit added an additional factor—whether any curative measures were taken. *United States v. Williams*, 435 F.3d 1148, 1160 (9th Cir. 2006).

*Id.* at 615.  In *Siebert*, the Court described the interrogation in that case as "by any objective measure" "a police strategy adapted to undermine the *Miranda* warnings."  *Id.* at 616.  "The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill.  When the police were finished there was little, if anything, of incriminating potential left unsaid."  *Id.*

Following *Siebert*, to evaluate whether a two-step interrogation took place—and consequently, whether any post-warning statements must be suppressed—the Court must know what statements were made prior to the *Miranda* advisement.  Here, however, the defense makes no claim of any pre-*Miranda* statements at all.  All the defense suggests is that there was the <u>potential</u> for a two-step interrogation because Defendant was not *Mirandized* immediately upon arrest.  "There is no justification for the agents' failure to administer the Miranda warnings to Ms. Maras immediately upon her arrest since they engaged in conversation with Ms. Maras during a lengthy drive to the courthouse."  Dkt. 25-1 at 6:23-25.  The defense offers no authority for the proposition that officers must present a *Miranda* warning at the first contact with a defendant.  Indeed, if the agents had given an initial advisement immediately upon arrest and not renewed it later during the interview itself, the defense might argue that the advisement was no longer effective.  *See, e.g.*, *Wyrick v. Fields*, 459 U.S. 42, 46-47 (1982) (courts must consider "the totality of the circumstances" in determining whether a waiver continues to be effective over time).[4]

The defense argues that the arrest, transportation, and questioning of Ms. Maras is "suggestive" of a two-step interrogation, but it presents no facts or argument that such an interrogation actually took place.

> The facts here are suggestive of a deliberate two-step process.  Ms. Maras was arrested at approximately 8:18 in the morning.  She was transported in the company of several federal agents to the Federal Courthouse in Riverside for a formal interview.  Based on the agent's report, that transportation took approximately an hour and forty minutes.  The conversations of the agents with Ms. Maras during that period of transportation were not recorded.  In the recording (Exhibit C), Agent Boswell[5] makes statements that these

---

[4] Such an argument would likely not be successful, see *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128 (9th Cir. 2005), but it could still be made.

[5] This was actually SA Trombetta.

1   conversations were not about the case, but we have only her unsupported statement to
2   that effect.

3   Dkt. 25-1 at 6:13-19. At no point in the motion to suppress does Ms. Maras indicate that she was asked

4   about this case prior to her *Mirandized* interview or indicate that she said anything in response to any

5   such questions.

6          In fact, the record before the Court shows that Ms. Maras voluntarily began talking about the

7   case, which involved her employment at a dentist's office, before the actual interview, but agents told

8   her to stop. Referring to an earlier conversation, SA Trombetta told Ms. Maras, "You touched a little bit

9   on the dentist's office; *I told you to stop talking—we'd talk about that later*." Dkt. 25-2, Ex. C at 8:30-

10  8:55 (emphasis added). Whatever Defendant said with respect to the dentist's office before the *Miranda*

11  warning was not memorialized or recorded, and it will not be offered at trial. If Ms. Maras recalls what

12  she told agents, if anything, she has not put it before the Court. But most critically in terms of the

13  motion to suppress, whatever she said was not the product of an interrogation. Instead, it was offered

14  spontaneously, and SA Trombetta directed her to stop talking about the subject until she could be

15  advised of her rights and formally interviewed.

16         Thus, there was no two-step interrogation. At the outset of the interview, SA Trombetta advised

17  Ms. Maras of her *Miranda* rights; Defendant indicated that she understood them; and then she willingly

18  answered questions. Everything she said in that interview is therefore admissible. "Conversely, giving

19  the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining

20  that a statement is involuntary even though given after warnings and voluntary waiver of rights requires

21  unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."

22  *Siebert*, 542 U.S. at 608-09.

23  **II.     Defendant's Statements In The Interview Were Voluntary**

24         Ms. Maras claims that the mere fact that she was arrested means that her statements in the

25  interview were involuntary and must be suppressed. The support for her claim of coercion is based on

26  the following facts:

27         • She was deprived of her phone.

28         • She was worried about her employer.

- She was worried about her son being left alone with his father for an extended period of time.

- She was arrested by numerous armed agents.

- She was not told what she was charged with or the potential exposure from those charges until two hours into the recorded interview.

- Although Ms. Maras did not expressly ask for a lawyer, she expressed concern that she should probably talk to an attorney because she was confused by the situation and she did not want to give the wrong answers.

- The implication throughout the interviews was that if she answered their questions, she would be able to go home, but if she did not, she would be placed in custody and thus deprived of her job and her son.

Dkt. 25-1 at 9:9-16. Some of these facts are inaccurate, and none of them support her claim that her statements in the interview were involuntary.

With respect to her claim that she was not told what she was charged with until two hours into the interview, the record shows otherwise. It was clear that Ms. Maras knew that she was arrested because of financial impropriety in connection with her prior employment at a dentist's office. Returning to SA Trombetta's quote, the agent said to her before the interview, "You touched a little bit on the dentist's office; I told you to stop talking—we'd talk about that later." Dkt. 25-2, Ex. C at 8:30-8:55. Ms. Maras then said: "It completely, like, took me by surprise. Yeah . . . So I'm trying to, like, go through my head to even think, like, how that could even be interpreted." *Id.* at 8:55-9:08. Obviously, Ms. Maras was thinking about the charges and the reason for her arrest, meaning that she knew why she was being interviewed. She also expressed no confusion during the interview why agents were asking her about her time working for the dentist and her use of the office credit card.

With respect to the claim that she was confused about the situation and expressed concern that she should probably talk to an attorney, that is more of a Sixth Amendment claim and less a claim of coercion, but it is without merit as well. As discussed above, Ms. Maras made a reference to talking to a lawyer. The interview was then paused, and after a brief break, undersigned counsel discussed with Ms. Maras her right to counsel. This included the fact that if Ms. Maras indicated that she did not want to speak to agents or wanted to speak to a lawyer, the interview would end. *Id.* at 2:02:55 – 2:03:50.

Ms. Maras stated that she understood that she had the right to counsel, and she specified that she was not invoking it. *Id.* 2:04:15 – 2:05:05. The interview then shifted to a different topic, one in which Ms. Maras is a witness, not a target, and agents asked no further questions about this case.

Defendant's implication that she only answered questions because she was faced with a choice of "answer questions and go home to your young son or refuse to talk and go to jail" is likewise unsupported by the interview itself. Before the mention of a lawyer, agents had offered Ms. Maras a lunch break. This offer was repeated after the discussion of her right to counsel, but Ms. Maras asked to skip lunch and continue to a discussion about the other investigation so that she could relieve her partner from childcare duty. *Id.* at 2:05:10. Agents agreed to do so. At no point did Ms. Maras ask whether responding to questions would result in her release, as opposed to custody if she did not. And no one from the government suggested that Ms. Maras's return to caring for her son—which was her understanding of what would happen following the interview—was contingent on waiver of her *Miranda* rights.

The remainder of the defense claims about Ms. Maras' fears and concerns during the interview do not support a claim that her answers were involuntary, as shown by the cases on which she relies. For example, in *Arizona v. Fulminante*, 499 U.S. 279 (1991), an imprisoned child murderer was subject to violence at the hands of other inmates. The Supreme Court held that a jailhouse informant's promise of protection in exchange for a confession, which the defendant gave, constituted coercion, although it was a "close question." *Id.* at 286-87. In *Blackburn v. State of Alabama*, 361 U.S. 199 (1960), the Court addressed the confession of an "insane and incompetent" defendant that was written by an officer and was produced after eight to nine hours of sustained questioning in "a tiny room which was upon occasion literally filled with police officers." *Id.* at 207. The Court found that this statement was involuntary. *Id.* at 207-08. In *Hutto v. Ross*, 429 U.S. 28 (1976), the Court explained how to distinguish voluntary versus involuntary statements. "The test is whether the confession was 'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" *Id.* at 30 (citing *Bram v. United States*, 168 U.S. 532, 542-543 (1897)). No such threats, violence, promises, or improper influence were present in the Maras interview.

Consideration of the factors in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), similarly leads to the conclusion that Defendant's assertions about the nature of her arrest and interview do not render her statements involuntary. Those factors include the youth of the accused, lack of education, low intelligence, the absence of any advice regarding the accused's constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment (such as the deprivation of food or sleep). *Id.* at 226. Ms. Maras is a woman in her late twenties, a mother of two. The interview revealed that she is intelligent and articulate, with the ability to run a small business. She was clearly advised of her rights to remain silent and her right to counsel. She was detained roughly two hours while in transport to the location of the interview, and the questioning about this case lasted for less than two hours. The tone of the interview was polite, even cordial. There was no physical punishment, as Ms. Maras was not only offered food and the opportunity for a break, but she elected to forgo these so she could return home more quickly. Thus, there is no basis for her to argue that the statements she made to agents during her interview were in any way coerced or involuntary.

## CONCLUSION

For the reasons set forth above, there was no two-step interrogation following Defendant's arrest, and the statements she gave to agents after being advised of her *Miranda* rights were voluntary. The Court should deny the motion to suppress those statements.

DATED: May 25, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney


_____/s/_____
KEVIN J. BARRY
Assistant United States Attorney